# Hunter's Estate.     Muhlenberg's Appeal.

*Trust and trustee—Parol trust—Evidence.*

In 1858 Cyrus Hunter, who was at the time insolvent, transferred to his brother Frederick all of his property, upon the verbal understanding that Frederick should pay Cyrus's debts, and return the surplus, if there should be any to Cyrus. The evidence did not show what property was transferred, and it did not appear that any settlement was ever made between the brothers. Frederick died in 1863, at which time unsatisfied judgments still remained against Cyrus. Prior to 1860, Cyrus owned an interest in certain real estate as heir of his father. In 1860 he and the other heirs conveyed their interests to Frederick. In 1861 Frederick conveyed this real estate to one Trexler for $140,000, subject to a payment of $600 per annum to the mother of Frederick and Cyrus for her life, and at her death

the sum of $10,000 was to be paid, two sixths to Frederick and one sixth to each of the other heirs, omitting Cyrus. In 1890 the widow died and Cyrus's trustee claimed one sixth of the $10,000 then become payable under the deed of 1861. *Held*, that on the theory of accounting the claimant had not the shadow of a right, nor was the evidence sufficiently clear, to contradict the title of Frederick under his deed from Cyrus.

Argued March 1, 1892. Appeal, No. 159, Jan. T., 1892, by Henry A. Muhlenberg, trustee of Cyrus J. Hunter and wife, from a decree of O. C. Burkes Co., distributing estate of Frederick O. Hunter, deceased. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

ALBRIGHT, P. J. of Lehigh Co., specially presiding, filed the following adjudication :

" The only controversy before the court arose upon a claim of said H. A. Muhlenberg as trustee as aforesaid.

" He asserts that one half of the item of $3,383.33, on the debit side of the account, being the amount received from the Reading Iron Company in payment of a charge on their lands, belongs to him as trustee; that it is not part of the estate of Frederick S. Hunter and ought to be stricken from the account. It is alleged that Frederick, at the time of his decease, held that sum (one half of $3,383.33) in trust for said Cyrus, and that by divers transfers it has become vested in him, the said trustee.

" The following are facts bearing upon said claim :

" Nicholas V. R. Hunter died in 1853 intestate, leaving a large estate. He left a widow, Hannah, and six children, two of whom were said Frederick and Cyrus. Said widow, by deed of July 29, 1853, released to said children all her interest in the estate of her late husband in consideration of certain property and sums, among them the annual sum of $600 during her lifetime out of the interest of her late husband in the real estate of the Reading Rolling Mill and Gas Pipe Works (which afterwards became the property of said Reading Iron Co.) On January 7, 1860, four of said children of Nicholas V. R. Hunter, deceased, one of whom was said Cyrus, conveyed to said Frederick their interest in certain real estate, late of their said father, including said Rolling Mill tract. The consideration named is $90,000 ; the receipt of the grantors for said sum is at the foot of the deed. On December 23, 1861, said Fred-

erick and the owner of the other share of the late interest of said intestate, Nicholas V. R. Hunter, in said Rolling Mill property, made conveyance thereof, subject to the annual payment of $600 to said Hannah during her lifetime, and at her decease $10,000, of which last-named sums two sixths were to be paid to said Frederick, and one sixth to each of his brothers and sisters, except said Cyrus. Said Frederick died August 20, 1863. Said Hannah died February 24, 1890. After her decease the share late of Frederick in said sum reserved was paid to Frederick's administrator, the present accountant. It is said two sixths, with some interest, it is the aforesaid sum of $3,383.33.

"The claimant relies mainly upon the testimony of Daniel: S. Hunter, a brother of said Frederick and Cyrus.

"The substance of his testimony is this:

"*Question.* State whether or not at that time your brother Frederick S. Hunter was trustee for your brother Cyrus J. Hunter, and when he became trustee and how and for what purpose?

"*Answer.* He did act as trustee for my brother Cyrus. This occurred probably between 1858 and 1860, whilst Frederick was living at Leesport as manager and part owner of the Leesport furnace; was myself a clerk there, living with my brother Frederick. Cyrus also lived there, was engaged in the mercantile business and became involved in his business affairs, accepted Frederick's assistance in his troubles, with the verbal understanding between them that Cyrus should transfer his interest in the Leesport furnace and in the Rolling Mill dower to Frederick to secure him in advances made in the settlement of his accounts, and have a very distinct recollection of hearing them discuss these matters, and that, if in the settlement of these claims of Cyrus, any portion of the property transferred to Frederick remained, it would be paid back to Cyrus. Frederick died in 1863, before any final settlement between him and Cyrus was made. He was trustee of all Cyrus had during that time; Frederick took Cyrus's property to pay Cyrus's debts and Cyrus never got it back, and Frederick held it at the time of his death; heard Cyrus say he had transferred property to Frederick; heard Frederick say he had received property from Cyrus to pay Cyrus's debts; they spoke about those claims

often and Frederick settled all the claims against Cyrus; never heard them say what the claims amounted to; do not know what claims Frederick paid; am satisfied some were from Philadelphia merchants and some from New York and Brooklyn; Cyrus was largely indebted; can't tell the amount, but it ran into thousands of dollars; know it was a transfer as collateral security; Frederick said to Cyrus, if there is anything left after closing your affairs you shall have it.

· " The following also appears:

" On June 17, 1865, Cyrus J. Hunter and Sarah his wife, by their writing transferred to Nicholas Hunter (brother of Cyrus), in consideration of $6,000, all the interest of Cyrus in the property set apart for the use of his mother during her life; the property is described to be a house on South Fifth street, Reading, and the furniture therein, a mortgage of $5,000 on the Moselem furnace, and $10,000 on said Rolling Mill property. Cyrus's interest in each of said items of property was one sixth, except in the $10,000 (as to that he claims that he owned one sixth also). Nicholas Hunter was declared a bankrupt on April 12, 1871. He was never discharged. All his property was sold, except what was transferred by said assignment of Cyrus and wife, as to which no action was taken by the assignees.

" On December 8, 1881, Nicholas assigned what had been transferred to him as aforesaid to Henry A. Muhlenberg, to hold in trust for said Cyrus and the latter's wife.

" After the decease of widow Hannah Hunter in 1890, Mr. Muhlenberg, the trustee, realized $838.33, Cyrus's share of the Moselem mortgage, and $2,998.01, Cyrus's portion of the proceeds of the Fifth street house, which had remained for the use of said Hannah. The Moselem mortgage was payable to Cyrus as surviving administrator of Nicholas V. R. Hunter. By arrangement of counsel concerned (the counsel in this matter), the amount of the mortgage was paid to Mr. Leaf, the accountant here, and he paid to Mr. Muhlenberg, the trustee, said $838.33. Mr. Leaf also had in hand the proceeds of the Fifth street house, and paid said $2,998.01 to Mr. Muhlenberg.

· " The court will also refer to certain other matters of fact which counsel for the parties have presented.

"From the records of the court of common pleas of this county, it is found that there were and are judgments against said Cyrus, and assignments and satisfactions aggregating $21,495.50. The amount of those satisfied is $10,090.81.

"Cyrus became insolvent, probably about 1859. After that at no time had he sufficient property to pay his debts, and his debts never were actually paid.

"It is alleged that while the deed of January 7, 1860, was absolute, there was an understanding that $10,000, a sum which would yield $600 interest annually, a part of the consideration, should remain unpaid, and that at the decease of the widow said principal should be paid to the heirs of Nicholas V. R. Hunter; that such understanding was recognized in the deed of December 23, 1861, in the form of said reservation of $10,000; that the provision that two sixths should be paid to Frederick (thus giving him what would have been Cyrus's share also) was pursuant to said arrangement that Frederick was to hold Cyrus's property to pay the latter's debts. It is claimed that the understanding was that what remained unexpended in discharging such debts should be transferred and delivered again to said Cyrus, that said one sixth of said $10,000 was not demandable in Frederick's lifetime, and down to the time of the widow's decease in 1890; that it was unexpended to pay said debts, and therefore said $1,691.66 would now belong to Cyrus, but for transfers of it by him, and that by virtue of such transfers it is vested in said Henry A. Muhlenberg as trustee.

"Cyrus owned 20 shares of Farmers' Bank stock. In 1859 he transferred it to Ames, president of a bank in New York; in 1861 Ames transferred the same to Frederick; in 1867, Clymer, a former administrator of Frederick's estate, assigned 11 of said shares to Sarah S. Hunter, the wife of said Cyrus. There was received in evidence in this proceeding the notes of the testimony given by Dr. H. H. Muhlenberg, now deceased, before the auditor on the account of said Clymer, administrator as aforesaid. (Dr. Muhlenberg was married to a sister of Cyrus and Frederick.) He testified that he knew that Cyrus's said bank shares were transferred as collateral to a New York city bank in 1859; that Frederick afterward went to New York to arrange Cyrus's affairs, and when he returned he told wit-

ness that he had redeemed the stock,—there were only ten shares left, and that he would give these to Cyrus's wife; that the ten shares did not belong to him, Frederick, they were the balance after the settlement, said he had arranged it, he would not pay them over to Cyrus but would give them to his wife. The report of said auditor was filed November 4, 1865. The auditor reported that by consent of the parties there was submitted for his adjudication the question of the ownership of ten shares of Farmers' Bank stock, standing in the name of Frederick S. Hunter and claimed by Cyrus, or rather in behalf of the latter's wife. Upon said testimony of H. H. Muhlenberg, the auditor found that said shares did not form part of the estate of said Frederick.

" Counsel for accountant in this proceeding offered said account and the auditor's report thereon, and also a later account of the same administrator and auditor's report thereon, filed April 23, 1870, to show that said estate was solvent, and large sums were distributed to the widow and heirs, and that no claim was made by Cyrus or any one claiming under him, except for said shares of stock. Said first report shows that $30,297.35, and the latter that $14,148.14, were distributed to the widow and children and legal representatives of said Frederick. There is no evidence, except what has been referred to, showing any act of Frederick tending to prove that he held the fund in question, or any other property of Cyrus, or owed to Cyrus the amount of said one sixth of $10,000 or any other sum. That the acts or declarations of other parties since Frederick's decease cannot be received to establish liability by him in his lifetime does not require demonstration. Considerable stress has been laid by claimant upon such acts and declarations of others, but whatever they might prove would have no bearing whatever upon the question presented, which is whether Frederick immediately before his decease held said one sixth of said $10,000 for Cyrus, or owed him the value of said interest.

" It is urged by claimant that at the time of the alleged transfer of property by Cyrus to Frederick to pay the former's creditors, Cyrus had a large amount of property; that he owned what is specified in his subsequent transfer to Nicholas, an interest in the Leesport Furnace, a stock of goods and other assets in the mercantile business in which he was then engaged,

said twenty shares of bank stock, and interest in his late father's estate. It is alleged that all Cyrus then possessed came into Frederick's hands to pay Cyrus's debts, and to return to Cyrus what should not be required for said purpose.

"Exactly what property Cyrus then had does not satisfactorily appear from the evidence. It is plain that he had considerable at one time,—that appears in various ways. The seizures of property under legal process and the satisfaction of judgments by executions and otherwise indicate it. At one time he had one sixth of his deceased father's estate, which amounted to from $100,000 to $200,000, but what he realized therefrom, when it was consumed or lost, does not appear, except that his portion of what was transferred by the deed of January 7, 1860, was $22,500. But manifestly he had debts to a considerable amount then, some of which were judgment liens.

"In 1859, he owned said bank shares. It is to be observed that the portion of these shares that came to Frederick's hands have been given to Cyrus's wife with Cyrus's consent, and are not in dispute now.

"Claimant refers to the transactions about the shares to show that Frederick received Cyrus's estate, and that Frederick had been reimbursed.

"Said shares were not transferred to Frederick, but to the bank president in New York, to secure a debt of Cyrus. Evidently by Cyrus's direction they were afterwards assigned to Frederick, and evidently he paid the debt they secured. What remained he gave to Cyrus's wife; as to that no present liability is alleged.

"Said transaction does not prove that Frederick received other property. But it is urged that Frederick said, about 1861, that he had redeemed the shares, that ten remained which he would give to Cyrus's wife. That they were the balance after the settlement. .

"It is plain that what was settled was the debt in New York for which the shares were pledged, not all of Cyrus's debts. Undoubtedly at the time in question, Cyrus owed large amounts. There were numerous judgments, including those held by Frederick. The fair inference from this transaction is that Fred-

erick was saving something from the wreck for Cyrus's family, when there was no hope of paying the debts, and nothing more.

"It is conceded by claimant that to establish the demand the evidence thereof must be precise, clear and satisfactory. To prevail, his claim ought to be such as would induce a chancellor to make a decree in his favor if he were complainant in a bill in equity, alleging what is here asserted and praying for the relief sought in this proceeding. It is urged in substance that upon a statement of the account of the alleged trust there would be a balance in favor of Cyrus.

"What ought to be placed on the debit side? All of Cyrus's property? What was it and what was its value? The bank shares would not come into such account.

"Is Cyrus's alleged portion of the $10,000 to be debited? If vague declarations concerning it were accepted to contradict the deeds, then it would be charged. Upwards of thirty years before it fell due by the widow's decease it had some value. If it were placed on the debit side it would stand alone. Surely claimant will not maintain that thirty years after these transactions, and nearly that long after the alleged trustee's decease, the latter's representatives must show items of credit (and in this proceeding) on pain of having a balance decreed against them. So far as the claim rests on the idea of an account, the claimant seems to concede that he must make out his demand, that is, show what was received and expended; this he has not done. On the theory of an accounting, claimant has not the shadow of a demand. How is the case if the claim is treated as an assertion that the $1,691.66 is not part of the estate of Frederick and is to be excluded from the account?

"The Rolling Mill property was not charged with the $10,000 until that burden was created by the deed of December 23, 1861. The interest of the widow and children of Nicholas V. R. Hunter in his title to that property was what the intestate law vested them with. When the widow released her dower interest therein there was no stipulation that $10,000 should remain in it; only that she should receive thereout annually $600 during her lifetime. When Cyrus and three of his co-tenants conveyed to Frederick, they did not provide that $10,000 should remain. That charge was created chiefly by Frederick (he owned five sixths and his sister, Mrs. Eckert, one sixth);

they had power to create the charge and to appoint its payment (the principal) to whomsoever ·they pleased. No doubt the three to such of whom they appointed that one sixth should be paid, gave a consideration, and no doubt it entered into the division of the whole of their deceased father's estate between them. But who shall say now that Cyrus was not excluded for the same reason that the others were included?        .

"Evidently the arrangement to charge $10,000 was made to relieve all concerned from the uncertainty of the value of the widow's annuity. Cyrus was to receive no part of it because no consideration therefor moved from him to the grantors in the deed of December 23, 1861. Certainly no such consideration is apparent. It was not appointing that what belonged to him should be paid to Frederick; his ·deed of January 7, 1860, released all his interest in the land. Are those deeds to be reformed so as to read that Cyrus at the decease of his mother is to receive one sixth of $10,000 on the unsupported testimony of Daniel S. Hunter, given thirty years after what he testifies about took place, and when what he says is rather his own conclusion than the declarations of the parties contracting?· Every consideration forbids such action. The testimony is vague, conveys no definite idea as to what the alleged contracting parties said, and is uncorroborated.

"It is not proved that the fund specifically claimed was ever the property of Cyrus.

"Entertaining these views, it is not necessary to decide whether the trustee has a standing in this proceeding to claim said fund, whether the demand falls within the exceptions to the rule that in a proceeding of this nature only creditors, legatees, and next of kin have a standing: See Marshall v. Hoff, 1 W. 440; McBride's Ap., 72 Pa. 480; Miller's Ap., 84 Pa. 391; High's Estate, 136 Pa. 222."

Exceptions to the adjudication were dismissed by the court.

· *Errors assigned* were the dismissal of exceptions.

*Henry A. Muhlenberg, p. p.*—The assignment included all of the property of Cyrus Hunter, and the terms upon which it was made may be proved by parol: 1 Perry on Trusts, 77; Kirkpatrick v. McDonald, 11 Pa. 387; Williard v. Williard, 56 Pa. 119; Dellinger',s Ap., 71 Pa. 425; Maffitt v. Rynd, 69 Pa.

380; Nixon's Ap., 63 Pa. 279; Pierce v. McKeehan, 3 Pa. 136; Lloyd v. Carter, 17 Pa. 216; Harrisburg Bank v. Tyler, 3 W. & S. 373; Thudium v. Yost, 20 W. N. C. 217–219.

*Horace A. Yundt,* for appellee, was not heard.

PER CURIAM, March 21, 1892.

The facts of this case are fully stated in the adjudication of the learned judge, who specially presided at the hearing in the orphans' court. There appears to be no error in the distribution, and the decree is affirmed on the opinion of the court below.

Decree affirmed and appeal dismissed, with costs to be paid by appellant.